# EXHIBIT F

1

1

2   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK
3   ----------------------------------------X
    STERLING NATIONAL BANK,
4
                              PLAINTIFF,
5                                Index #:
                                 604015/04
6
                    -against-
7
    MARIO J. BIAGGI, JR., KEITH ALLEN ORLEAN & PHILLIP
8   CERVONE,
9                             DEFENDANTS.
    ----------------------------------------X
10

11                    DATE: January 31, 2007

12                    TIME: 10:10 a.m.

13

14          EXAMINATION BEFORE TRIAL of the

15   Plaintiff, STERLING NATIONAL BANK, by a Witness,

16   JOHN GALLO, taken by the Defendants, pursuant to a

17   Court Order, held at the office of Biaggi &

18   Biaggi, 220 Fifth Avenue, New York, New York

19   10001, before a Notary Public of the State of New

20   York.

21

22

23

24

25

```
1                     GALLO
2    Would you read the contents of that?
3         A.    "This will confirm a written" --
4         Q.    No, no, to yourself.
5         A.    Okay.
6         Q.    Had you ever seen that letter before?
7         A.    Yes.
8         Q.    When did you see it?
9         A.    I guess back in 2003.
10        Q.    And how did it come to pass that you saw
11   that letter?
12        A.    Mr. Patel showed it to me.
13        Q.    And what did Mr. Patel say to you when
14   he showed you the letter?
15        A.    I don't remember other than are you
16   satisfied in this participation.
17        Q.    Do you know who Mr. Cucci is?
18        A.    I believe he was one of the investors in
19   MA Funding.
20        Q.    And why is it that Mr. Cucci or
21   Mr. Glazier wrote this letter to Mr. Patel?
22             MR. ZILUCK:  Objection, I'm not going
23        to let him answer a question about why
24        Mr. Glazier wrote a letter.
25        Q.    You can answer the question.
```

Case 7:08-cv-02151-SCR  Document 6  Filed 03/26/2008  Page 4 of 38

1                    GALLO

2      Q.    You don't remember whether you had any

3  conversations with anybody?

4      A.    That's correct.

5      Q.    Were you ever aware of Mr. Cucci

6  releasing the bank from any of the potential claim

7  that he had?

8      A.    I'm not aware of it.

9      Q.    Going back to Mr. Farquhar, when I say

10 securing a lease, that the bank secured a lease,

11 that's what I meant, the bank secured a release

12 from Mr. Farquhar, is that what you understand me

13 to have meant?

14     A.    Correct.

15     Q.    When in 2002 did you discuss the

16 securing of a release from the bank in favor of

17 the bank from Mr. Farquhar?

18     A.    When?  In the middle of 2002.

19     Q.    Who is Mr. Farquhar?

20     A.    My understanding, he was an investor in

21 MA Funding.

22     Q.    And what's the basis for that

23 understanding?

24     A.    I was told that by Keith Orlean and

25 Phil.

```
 1                    GALLO
 2          MR. ZILUCK:  Cervone.
 3     A.    Cervone.
 4     Q.    And you were told that in 2002, the
 5 middle of 2002?
 6     A.    Yes.
 7     Q.    Were you aware of him prior to that
 8 date?
 9     A.    No.
10     Q.    Do you know if anybody at the bank was
11 aware of him prior to that date?
12     A.    I don't know.
13     Q.    And what was the conversation that you
14 had with Mr. Orlean and Cervone regarding the
15 securing of a release from Mr. Farquhar?
16          MR. ZILUCK:  Hold on a second.  Okay,
17     you can answer.
18     A.    They were going to form a company to
19 help defray their liability under MA -- under
20 Merchants Advantage that would enable us to reduce
21 the outstandings in Merchants Advantage.
22     Q.    Okay, continue.  Do you want me to read
23 back the initial question?
24          MR. BIAGGI:  Let me have the initial
25     question, please.
```

```
 1                    GALLO
 2            (Whereupon, the referred-to question was
 3       read back by the Reporter.)
 4       Q.    What else, after they told you they
 5   wanted to establish another company there was
 6   further conversation I imagine after that?
 7       A.    They would use Mr. Farquhar's $1,000 as
 8   capital in that company.
 9            MR. HANSCOM:  Objection, objection.
10       Q.    You can answer.
11            MR. ZILUCK:  Are you objecting to the
12       question or the answer?
13            MR. BIAGGI:  Or the whole litigation?
14            MR. HANSCOM:  Yeah, the whole
15       litigation, the whole thing is offensive.
16            MR. ZILUCK:  Because you can't object
17       to his answer.  If you don't like his answer
18       you can move to strike but he gets to answer
19       it.
20       A.    Mr. Farquhar's $100,000 could be capital
21   and it could be considered capital in that
22   company.
23       Q.    Capital in the new company?
24       A.    Correct.
25       Q.    Well, did they get additional money or
```

Case 7:08-cv-02151-SCR   Document 6   Filed 03/26/2008   Page 7 of 38

```
 1                    GALLO

 2    they were using the 100,000 that was loaned on

 3    Merchants Advantage, you're talking about that

 4    100,000, the one that was part of the

 5    participation agreement?

 6         A.    It's just an accounting entry, there's

 7    no cash involved.

 8         Q.    And did they get anything in exchange

 9    for Sterling securing the release from a hundred

10    thousand dollars, did Sterling provide this new

11    company anything of any value?

12         A.    We provided a line of credit.

13         Q.    You provided another line of credit for

14    the new company?

15         A.    Correct.

16         Q.    And how much was that line of credit

17    for?

18         A.    I believe a hundred thousand dollars.

19         Q.    A hundred thousand dollar line of credit

20    or a $500,000 line of credit?

21              MR. ZILUCK:  Asked and answered.

22         A.    I believe it was a 100,000.

23         Q.    Well, do you have any records that

24    indicate how much that was?

25              MR. ZILUCK:  Objection.  Go ahead.
```

1                           GALLO

2        A.      Yes.

*Questioning not allowed to go on*

3              MR. ZILUCK:   I'm not going to let him

4     answer any other questions concerning any

5     other business relationship with the bank

6     formed but maybe your next question won't be

7     that.  Go ahead.

8              MR. BIAGGI:  What was the last

9     question?

10             (Whereupon, the referred-to question was

11    read back by the Reporter.)

12             MR. BIAGGI:  So are you telling me that

13    if I ask him where those records are --

14             MR. ZILUCK:  I'm not going to let you

15    go into any inquiry about any other lines of

16    credit or anything that the bank established.

17             MR. BIAGGI:  Just so it's clear and --

18    they secured a release from Mr. Farquhar,

19    another company was set up.

20             MR. ZILUCK:  For the purpose of

21    reducing Merchants balance.

22        Q.      Well, who was in the other company, to

23    your knowledge?

24        A.      Phil and Keith.

25        Q.      Was Mr. Farquhar involved?

1                    GALLO

2        A.     I have no idea.

3        Q.     Was I involved?

4        A.     No.

5        Q.     Did I even know anything about that at

6    that time?

7               MR. ZILUCK:  Objection, how is he

8        supposed to know that.

9        Q.     To your knowledge?

10       A.     I don't know.

11       Q.     Well, you didn't discuss it with me, did

12   you?

13       A.     No, I did not.

14       Q.     Did you discuss this securing a release

15   and giving this additional company an additional

16   line of credit with anybody at the bank prior to

17   you doing it?

18       A.     No.

19       Q.     You did it just on your own?

20       A.     Correct.

21              MR. BIAGGI:  I'm going to call for the

22       production again of all records relative to

23       the separate company that was established in

24       which Mr. Gallo provided an additional line of

25       credit in exchange for this release that the

```
 1                          GALLO

 2        bank secured.

 3        Q.    Now, was it your understanding that --

 4        A.    Can I respond to what you just said?

 5              MR. ZILUCK:   No, no, no, no.

 6        Q.    I don't have a question for you but go

 7   ahead if you want.

 8              MR. ZILUCK:   No.

 9        Q.    I'm asking you what you were going to

10   say.

11        A.    Not in response to approve my position

12   in Merchants Advantage, not in response to the

13   Farquhar release.

14        Q.    So the release had nothing to do with it

15   at all in terms of giving him the line of credit?

16        A.    No.

17        Q.    Nothing to do with it, is that what

18   you're saying?

19        A.    It was part of it.

20        Q.    You wanted to secure it for some reason,

21   right?

22        A.    I wanted to get a hundred thousand

23   dollars of subordinated money off my books.

24        Q.    Because it was a liability attached to

25   that subordination to the bank, correct?
```

```
 1                         GALLO
 2              MR. ZILUCK:  Objection to the extent it
 3         calls for a legal response.
 4         Q.    Why did you want to get it off your
 5    books?
 6         A.    Because it's on my books and nothing was
 7    being paid on it.
 8         Q.    Well, that means in fairness there was a
 9    potential liability to the bank?
10         A.    But it's not my payment, Merchants
11    Advantage has to pay it.  Merchants Advantage has
12    to pay that money.
13         Q.    Why did you want to secure a release
14    that ran to the benefit of the bank?
15         A.    Because the participation is with MA
16    Funding, this guy was an investor with MA Funding,
17    that was my understanding so why not get a
18    release.
19         Q.    Why not get a release?
20         A.    Yeah, why not.
21         Q.    I didn't ask you why not but why did you
22    get the release?
23         A.    Why not, why not get a release.  The guy
24    has eliminated his participation -- he's
25    eliminated not his participation; his potential
```

1                    GALLO

2    claim to the bank.

3        Q.    Okay, that's what I'm getting at.

4        A.    All right.

5        Q.    Is in part of the process of setting up

6    this separate line of credit for Keith and Phil

7    and perhaps other people, you don't know, you

8    wanted to eliminate Mr. Farquhar's potential claim

9    against the bank, correct?

10       A.    Correct.

11       Q.    Now, Mr. Farquhar had a potential claim

12   in your estimation because of the participation

13   agreement that was entered into MA Funding and the

14   bank or for some other reason?

15           MR. ZILUCK:   I'm not going to let him

16       answer that question.   You're asking him to

17       interpret the legal consequence of that

18       document.

19           MR. BIAGGI:   My question is going to

20       his understanding of the reason why he secured

21       a release on behalf of Sterling and then the

22       loan for the same people who had a problem

23       with Merchants Advantage this additional line

24       of credit.

25           I need to explore that because I need

EXHIBIT G

# ADVANTAGE
## CAPITAL
PARTNERS

October 23, 2001

Sterling National Bank
500 Seventh Avenue
New York, NY 10018

Dear Mr. Gallo,

We hereby request a meeting at your earliest convenience to discuss the status of the Sterling loan to Merchant's Ad-Vantage in which we bought a 43% participation on October 3, 2001.

Despite our letter to you on October 12, 2001 outlining the extraordinary flaw in your funding system to Merchant's Ad-Vantage and several follow-up discussions with Arun Patel detailing over $1.5MN worth of collateral that is possibly insubstantial, we have received no communication from you indicating what actions you are taking to substantiate the collateral of this loan. We are very concerned that at least $600,000 of the Sterling loan to Merchant's Ad-vantage was unsecured by specific collateral on the day that we invested in the Participation.

On several occasions we have spoken with Arun and requested that Sterling stop advancing money to Merchant's until the fatal flaw in the funding system is corrected and a course of remedial action is determined. Despite assurances from Mr. Patel on two occasions that no more advances would be made until a plan was in place, four additional advances have been made totaling over $450,000 — without any assurance that the proposed loans that are the basis for those advances have actually been made by Merchant's Ad-vantage and that the new specific collateral actually exists. We believe that this constitutes willful misconduct.

We were told verbally that you would be conducting an audit and that we would get the results of that audit upon its completion. The audit was scheduled for last Thursday, October 18th, 2001. We have received no information and our call to Mr. Patel on Friday October 19th, 2001 has not been returned. However, we do note that Sterling continues to make advances to Merchant's

We look forward to meeting and resolving these issues as soon as possible.

Sincerely,

Scott Murphy
Vice President

**NEW YORK**    521 Madison Avenue, 7th floor • New York, NY 10022 • (212) 893-8800 • (212)893-8700 (fax)
NEW ORLEANS                                                                    www.advantagecap.com
SAINT LOUIS
TAMPA

# EXHIBIT H

C                                    COP 1

1    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK
2
     ------------------------------------------X
3
     JAMES CAMINO,
4
                         Plaintiff,              Index No.
5                                                60388/05.
           -against-
6
     STERLING NATIONAL BANK, JOHN GALLO
7    and ARUN PATEL,

8                         Defendants.

9    ------------------------------------------X

10

11                    DATE:   December 6, 2007.

12                    TIME:   10;10 A.M.

13

14          EXAMINATION BEFORE TRIAL of the Defendant

15   by JOHN GALLO, taken by the Plaintiff, pursuant to

16   Order, held at the law offices of Biaggi & Biaggi,

17   220 Fifth Avenue, Suite 1701, New York, New York

18   10001, before Carole P. Adkins, CSR., a Notary

19   Public of the State of New York.

20

21

22

23

24

25

1                    J. Gallo

2       Q    What else was said at this conversation?

3       A    He said I don't want you to advance any more money.

4       And I told him that you guys wanted to -- said you were

5    going to make good on it.  And the only way we are going to

6    do it if we can advance money.

7       And he said I don't want to do that.  I want to be paid

8    if you are going to advance money.

9       Q    Anything else that was said at the conversation?

10      A    To the best of my knowledge, that was all that

11   was said.

12      Q    Do you remember any further conversations you had

13   with Mr. Murphy?

14      A    No.

15      Q    At all regarding this incident?

16      A    Other than I told him I was going to pay him

17   out.

18      Q    When you said "you," you meant Sterling was going

19   to pay him out?

20      A    Correct.

21      Q    Why was Sterling going to pay him out?

22      A    Because they weren't agreeable to try to solve the

23   problem because they were brand new in the case.

24      Q    Did they have any merit as far as what they were

25   saying to you as far as being paid out?

```
 1                         J. Gallo
 2        Did you feel there was any merit in their position or
 3    request?
 4        A    You want my opinion whether there was merit?
 5        Q    Yes.
 6              MR. ZILUCK:   Objection.
 7        A    I don't know.
 8        Q    So their request that they had for 1.9 million
 9    dollars, the bank gave them money, but you are not really
10    sure whether their request had any real merit to it any way
11    is what you are saying?
12        You said I don't know.
13              MR. ZILUCK:   Objection.
14        A    In their mind it had merit.
15        Q    I am saying in your mind did it have any merit?
16              MR. ZILUCK:   Objection.
17        Q    You don't know or you do know?
18        A    I don't know.
19        Q    So Sterling gave them 1.9 million dollars, and you
20    weren't sure in your mind if it had any merit to request pay
21    back?
22        A    It was a potential liability.
23        Q    So there was merit in your mind to their request?
24              MR. ZILUCK:   Objection.
25        A    Merit?
```

1                          J. Gallo

2        They asked for the money and they just got into the

3   deal.

4        Q    There was merit to their request is what you are

5   saying?

6                    MR. ZILUCK:   Objection.

7        Q    Was there merit or wasn't there?

8        A    They had a right to ask for money.

9        Q    Was there merit or wasn't there?

10       A    Define merit for me.

11       Q    What do you mean by merit?

12       A    I don't know.

13       Q    You never heard of the word merit before?

14       A    No, I am not that --

15       Q    You are not that bright?

16       A    I am not that bright.  I am not that bright.

17       They have a right to ask for the money, okay.  They have

18  the right to ask for the money under the terms.  So you have

19  a choice.  I can get sued or give them their money back.

20       Q    Well, you gave them their money back because

21  obviously Sterling thought they had a right to get their

22  money back.

23       No?

24       A    I wanted to avoid a lawsuit.

25       Q    Why did you think there was a potential lawsuit

```
1                          J. Gallo
2    against the bank in connection with handling this?
3                     MR. ZILUCK:  Objection.
4         A     They are in the deal for a short period of time and
5    the collateral goes bad.  The collateral goes bad in a short
6    period of time.
7         That is the case.
8         Q     You wanted to avoid a lawsuit against Sterling,
9    right?
10        Is that what you were concerned about?
11                    MR. ZILUCK:  Objection.
12        A     Sure
13        Q     And you felt there was a potential claim from
14   Advantage Capital Group against Sterling, and that is why
15   Sterling gave the money back; correct?
16                    MR. ZILUCK:  Objection.
17        A     Correct.
18        Q     Are you saying there you felt there was a potential
19   claim against Sterling and Sterling did nothing wrong?
20        Is that your testimony?
21        A     Sterling did nothing wrong.
22        Q     You felt Sterling did nothing wrong, but they were
23   still exposed to a potential lawsuit?
24        A     Correct.
25        Q     How could they be exposed to a potential lawsuit in
```

```
1                        J. Gallo
2    receivable which by definition means it is funded.
3         Q    Now you said the procedure from Sterling's
4    perspective could have been better; correct?
5         A    In hindsight, yes.
6         Q    Well, in fact, you changed the procedure, did you
7    not, regarding the funding of the loans and how they were
8    funded?
9         At some point you changed the procedure; didn't you?
10        A    Yes.
11        Q    And the reason you changed the procedure was
12   because the prior procedure really wasn't working to your
13   satisfaction; correct?
14        A    Not that it wasn't working to my satisfaction.  It
15   turned out that we received phoney contracts.
16        Q    And yet you still continued to work with people who
17   you felt gave you phoney contracts?
18        A    Mr. Biaggi and Mr. Glazer came and saw me and said
19   they were going to make it good for us.
20        Q    What did we say to you, we were going to write out
21   a check for you?
22        A    We are going to make it good.  We are going to get
23   this thing back into formula, and this is the way we are
24   going to do it.  This is the way we are going to do it, but
25   you guys got to give me some money.
```

1                          J. Gallo

2    trustee for M.A. Funding.

3          Is that your testimony?

4          A    No, it is not.  I changed my mind.

5          Q    You changed your mind now because I asked you if it

6    was in the agreement that it says we are a trustee.

7          In other words, Sterling was a trustee on M.A. Funding's

8    behalf?

9                     MR. ZILUCK:  Objection.

10                    Document speaks for itself.

11         A    That is what the document says.

12         Q    So independent of the document, you don't know

13   whether it was a trustee or not, Sterling was a trustee for

14   M.A. Funding; correct?

15         A    I don't understand the question.

16         Q    In other words, you didn't see the document, the

17   participation agreement?

18         You have no opinion as to whether or not Sterling was a

19   trustee for M.A. Funding; is that your testimony?

20         A    No.

21         Q    Well, was Sterling a trustee for M.A. Funding?

22                    MR. ZILUCK:  Objection.

23         A    Yes, it was.

24         Q    And what does that mean when you say Sterling was

25   a trustee for M.A. Funding?

1                           J. Gallo

2        What duties and responsibilities did Sterling have

3    towards M.A. Funding as trustee?

4                  MR. ZILUCK:   Objection.

5        A    I think it is defined in the agreement.

6        Q    Putting the agreement aside for the moment, did you

7    have any independent knowledge given your years of working at

8    the bank as to whether or not Sterling is a trustee, would

9    have certain responsibilities towards the trustee beneficiary

10   in this case, M.A. Funding?

11       A    Right.

12       The responsibility, Number One, we collect money to turn

13   it over, whatever is due under the loan agreement, under the

14   Participation Agreement to M.A. Funding.

15       Q    Okay.

16       A    And we handle the loan, the underlying loan, the

17   way we would handle any other loan.

18       Q    Which means you had a responsibility to monitor it,

19   to make sure it was being performed correctly?

20       A    Correct.

21       Q    And that would be one of your duties as trustee;

22   correct?

23       A    Correct.

24       Q    And do you feel that Sterling did that in this

25   situation, that they monitored properly the Merchant

1                              J. Gallo

2        Q    The note that was canceled, Mr. Farquhar, okay, did

3    Sterling give anything of value to Mr. Orlean, Cervone or

4    Merchant Advantage in connection with the cancellation of

5    that note?

6         Do you understand what I am saying, sir?

7        A    What does value mean?

8        Q    Who secured the actual cancellation of the note?

9         Who actually got the note to be canceled, was that you,

10   Mr. Cervone, Mr. Orlean; if you know?

11       A    I don't know for sure.

12       Q    Do you know if it was you or not?

13       A    It was not me.

14       Q    It was either Mr. Orlean or Mr. Cervone?

15       A    Right.

16       Q    When they got the note canceled, did you have an

17   agreement or understanding with them that Sterling would give

18   them or a company they were associated with something of

19   value so they could continue doing business?

20       A    What I gave them -- and I am telling you what I

21   gave them -- I gave them a line of credit to start a new

22   business for weekend receivables, weekend credit card

23   receivables that were going to where the excess funds were

24   going to be used to pay down Merchant Advantage loan and help

25   support their guarantee of the Merchant Advantage loan.

```
 1                         J. Gallo
 2        That is what I gave them.
 3        Q     What company?
 4        Was it another company that they established?
 5        A     Yes.
 6        Q     What was the name of the company?
 7        A     I don't know.
 8        Q     If I leave a blank in the record, would you be able
 9   to fill it in?
10        A     Yes.
11        I don't know the exact name.
12        Q     Would it be fair to say you gave them a five
13   hundred thousand dollar line of credit?
14        A     I don't know.  It was at least one hundred
15   thousand.
16        Q     Okay, we know it was at least a hundred thousand.
17   I am asking you you gave them a five hundred thousand line of
18   credit, didn't you, sir, with respect to this company?
19        A     I would have to check my records.
20        Q     I want you to check your records and leave a space.
21   I would like a response of whether you gave them five hundred
22   thousand or the precise line of credit you gave them in
23   connection with them securing the cancellation of this
24   promissory note.
25        Leave a space in the record, and I want to clarify
```

# EXHIBIT I

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X

JAMES CANINO,

                              Plaintiff(s)


                        -against-




STERLING NATIONAL BANK, JOHN GALLO
      and ARUN PATEL




--- ------------------------------------------------------X
To the above named Defendant

Date Filed: 11/1/05

Index No.: 05603887

Plaintiff designates

**NEW YORK**
County as the
Place of Trial

The basis of the venue
CPLR 507

**SUMMONS**
**Plaintiff Address is:**

198 Terrace Avenue
Hasbrouck Heights, N.J.

 

     **You are hereby summoned** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service or (within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded herein.

Dated:  October 26, 2005

Attorney(s) for Plaintiff
Richard M. Biaggi., Esq.
Biaggi & Biaggi, Esqs.
220 Fifth Avenue, Suite 1702
New York, New York 10001
(212) 233-8000

Defendant's address:

Sterling National Bank
512 Seventh Avenue
New York, New York 10018

John Gallo
c/o Sterling National Bank
512 Seventh Avenue
New York, New York 10018

NEW YORK
COUNTY CLERK'S OFFICE

NOV 0 1 2005

NOT COMPARED
WITH COPY FILED

JRapa
11/1/05

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------X
JAMES CANINO

                           PLAINTIFF,                       INDEX NO.

                  -against-                          VERIFIED
                                                       COMPLAINT

STERLING NATIONAL BANK, JOHN GALLO and
ARUN PATEL

                         DEFENDANTS.
-----------------------------------------------------------------------X

     I, James Canino, through the undersigned counsel, Richard Biaggi Esq., do hereby depose and swear under penalty of perjury as follows:

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

     1.    On or about April 25, 2001 a contract entitled "Participation Agreement" was entered into between defendant Sterling National Bank (hereinafter referred to as "Sterling") and M.A. Funding Inc. (referred to in the Participation Agreement as the Participant but hereinafter referred to in this complaint as "M.A. Funding").

     2.    Pursuant to the Participation Agreement Sterling granted M.A. Funding a participating interest in a written Loan, Security and Service Agreement (the "Loan Agreement") that Sterling had entered into with Merchants Advantage Corporation (hereinafter referred to as "MAC") on or about November 12, 1999.

     3.    The maximum initial aggregate participation amount which M.A. Funding could give to Sterling pursuant to the Participation Agreement was One Hundred and Fifty Thousand Dollars ($150,000.00) which, when received by Sterling from M.A. Funding, was used to pay down the then existing balance on the MAC loan funded pursuant to the Loan Agreement.

4.    In exchange for receipt of the funds from M.A. Funding, Sterling obligated itself to undertake various contractual responsibilities including the payment of the sum of eighteen percent (18%) interest per annum on all monies advanced to Sterling pursuant to the Participation Agreement.

5.    In addition, Sterling agreed to "occupy the status of trustee for the Participant's benefit with regard to Participant's participation in the monies due under the Loan Agreement" and to "hold Participant's participating interest and the collateral securing the same as Participant's trustee."

6.    On or about August 16, 2001, plaintiff tendered One Hundred Thousand Dollars ($100,000.00) to M.A. Funding and received a promissory note for said amount from M.A. Funding payable at the rate of eighteen percent (18%) per annum.

7.    At the time plaintiff made his investment and as an inducement for plaintiff making said investment, plaintiff and his agent were provided by Sterling with a copy of the Participation Agreement.

8.    At the time plaintiff made his investment and as an inducement for plaintiff making said investment, plaintiff and his agent were provided by Sterling with Sterling bank documents which indicated that the eligible collateral as that term was defined by the Loan Agreement was more than twenty five percent (25%) greater than the loan to MAC.

9.    At the time plaintiff made his investment and as an inducement for plaintiff making said investment, plaintiff and his agent were told that his investment into M.A. Funding would be immediately transferred to Sterling Bank pursuant to the Participation Agreement and that Sterling would assume a contractual responsibility to act as trustee for the funds that plaintiff would be investing into M.A. Funding.

10.   That after plaintiff made his investment into M.A. Funding said investment was transferred to Sterling as promised pursuant to the Participation Agreement and used to participate in Sterling's loan to MAC pursuant to the Loan Agreement.

11.  That Sterling amended the Participation Agreement to increase the maximum aggregate participation amount Sterling would accept from M.A. Funding to Three Hundred Thousand Dollars ($300,000.00), Five Hundred Thousand Dollars ($500,000.00) and ultimately Six Hundred Thousand Dollars.

12.  That the Participation Agreement was amended by Sterling to expressly allow the individual investors in M.A. Funding, including plaintiff, to participate in the Loan Agreement via M.A. Funding.

13.  At the same time that Sterling was representing that the collateral for MAC's loan was adequate, it knew and/or reasonably should have known that its representation, set forth in paragraph eight herein of this complaint, i.e. that the eligible collateral as that term was defined by the Loan Agreement was more than twenty-five percent (25%) greater than the loan to MAC, was false, thereby fraudulently inducing plaintiff to invest into M.A. Funding and ultimately as a Participant into the Loan Agreement.

14.  That after plaintiff loaned $100,000 to M.A. Funding so that M.A. Funding could increase its participation interest in the Loan Agreement, Sterling began to pay the 18% interest or $1500.00 per month it was required to pay pursuant to the Participation Agreement to M.A. Funding who I turn forwarded said payments to plaintiff in accordance with the initial understanding of Sterling, the plaintiff and M.A. Funding.

15.  Sterling, through M.A. Funding, continued to fund to plaintiff said interest payments from September, 2001 until November, 2002.

16.  Upon information and belief, before Sterling ceased making said interest payments, Sterling had also entered into a Participation Agreement with the Advantage Capital Group (hereinafter referred to as "ACG") pursuant to which ACG invested One Million Nine Hundred Thousand Dollars ($1,900,000.00) as a participant in the Loan Agreement.

17.  Upon information and belief, ACG was also misled into believing that the collateral which secured the MAC loan was eligible collateral as that term was defined in the Loan Agreement.

18.  Upon information and belief, ACG, like M.A. Funding, acquired from Sterling a participation interest in the Loan Agreement.

19.    Upon information and belief, within weeks after ACG delivered its funds to Sterling, ACG uncovered Sterling's fraudulent misrepresentations regarding the collateral and demanded return of its monies.

20.    When confronted with ACG's allegations of fraud and malfeasance, Sterling within weeks of ACG's demand returned the One Million Nine Hundred Thousand Dollars ($1,900,000.00) ACG had invested.

21.    After returning ACG's investment and without informing M.A. Funding or the plaintiff, Sterling surreptitiously negotiated a release with one of the investors in M.A. Funding, Ken Farquhar ("Farquhar"), wherein Farkuhar released Sterling from liability for any potential claims brought by Farkquhar for Sterling's actions as trustee of the funds invested by M.A.Funding.

22.    Upon information and belief, in exchange for Farkquhar's release, Sterling established a separate line of credit under a different company (the "Second Company") in which officials of MAC and Farkquhar had an interest with Sterling's knowledge, direction and/or consent.

23.    Upon information and belief, Sterling then diverted the collateral that should have been applied to the MAC loan, and which had been securing plaintiff's investment, to the separate loan of the Second Company and by so doing jeopardized the collateral which was securing the plaintiff's investment as well as the investment of the other M.A. Funding investors who, like plaintiff, and unlike Farquhar, had not been advised of Sterling's scheme.

24.    Upon information and belief, and despite the fact that the Participation Agreement and the participation agreement entered into with ACG are virtually identical, Sterling has concealed the fraud from the M.A. Funding investors and has to date failed to return their money despite their contractual obligations to act as fiduciary.

25.    At the time of Sterling's action described hereinabove, the two senior bank officials responsible for making the above misrepresentations,

establishing the loan for the Second Company and providing documentation upon which plaintiff relied in making his investment, were Arun Patel ("Patel") and John Gallo ("Gallo").

26.   Said officials acted in breach of their individual as well as Sterling's contractual and fiduciary duties by, among other things, misrepresenting the collateral at the time plaintiff invested his money, unilaterally dealing with only one of the investors in M.A. Funding to secure an individual release and promise not to sue Sterling in exchange for establishing a different line of credit the establishment of which jeopardized the plaintiff's collateral and in concealing the fraud from plaintiff.

27.   On or about December, 2002, M.A.'s Funding Board of Directors assigned to the holders of the promissory notes, including plaintiff, all of the Corporation's rights, title and interest under the Participation Agreement with Sterling.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT STERLING FOR FRAUD

28.   Plaintiff repeats and reiterates each and every allegation previously alleged as though more fully set forth herein at length.

29.   The defendant Sterling made the representations to plaintiff, provided the documentation alleged and took the actions set forth in paragraphs one through twenty-five of this complaint.

30.   The representations and actions were false and Sterling knew that they were false in that (i) the collateral at the time plaintiff invested into M.A. Funding was not as it was represented to be by Sterling; (ii) Sterling, without plaintiff's consent or knowledge, established another loan with a Second Company, negotiated a release with only one of the M.A. Funding investors so that said investor could benefit from this new loan and diverted contracts from customers of MAC which had originally been used as collateral to protect plaintiff's security; and (iii) purposely concealed said fraud from plaintiff while acknowledging it to ACG and returning ACG's monies that ACG had advanced pursuant to a participation agreement similar to the Participation Agreement entered into with M.A. Funding.

31. The false representations of the aforementioned facts have caused injury to plaintiff and have defrauded plaintiff of his money.

32. Plaintiff reasonably relied to his detriment upon the misrepresentation of material facts and concealment of material facts.

33. The fraudulent actions and misrepresentations of Sterling have directly damaged plaintiff in the sum of One Hundred Thousand Dollars ($100,000 ) plus 18,000 per year from the date of the last payment on November 14, 2002 and continuing at the rate of 18% per year.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANT GALLO FOR FRAUD

34. Plaintiff repeats and reiterates each and every allegation previously alleged as though more fully set forth herein at length.

35. The defendant Gallo made the representations to plaintiff, provided the documentation alleged and took the actions set forth in paragraphs one through twenty-five of this complaint.

36. The representations and actions were false and Gallo knew that they were false in that (i) the collateral at the time plaintiff invested into M.A. Funding was not as it was represented to be by Sterling; (ii) Gallo, without plaintiff's consent or knowledge, established another loan with a Second Company, negotiated a release with only one of the M.A. Funding investors so that said investor could benefit from this new loan and diverted contracts from customers of MAC which had originally been used as collateral to protect plaintiff's security; and (iii) purposely concealed said fraud from plaintiff while acknowledging it to ACG and returning ACG's monies that ACG had advanced pursuant to a participation agreement similar to the Participation Agreement entered into with M.A. Funding.

37. The false representations of the aforementioned facts have caused injury to plaintiff and have defrauded plaintiff of his money.

38. Plaintiff reasonably relied to his detriment upon the misrepresentation of material facts and concealment of material facts.

39. The fraudulent actions and misrepresentations of Gallo have

directly damaged plaintiff in the sum of One Hundred Thousand Dollars ($100,000 ) plus 18,000 per year from the date of the last payment on November 14, 2002 and continuing at the rate of 18% per year.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST
## DEFENDANT PATEL FOR FRAUD

40.    Plaintiff repeats and reiterates each and every allegation previously alleged as though more fully set forth herein at length.

41.    The defendant Patel made the representations to plaintiff, provided the documentation alleged and took the actions set forth in paragraphs one through twenty-five of this complaint.

42.    The representations and actions were false and Patel knew that they were false in that (i) the collateral at the time plaintiff invested into M.A. Funding was not as it was represented to be by Sterling; (ii) Patel, without plaintiff's consent or knowledge, established another loan with a Second Company, negotiated a release with only one of the M.A. Funding investors so that said investor could benefit from this new loan and diverted contracts from customers of MAC which had originally been used as collateral to protect plaintiff's security; and (iii) purposely concealed said fraud from plaintiff while acknowledging it to ACG and returning ACG's monies that ACG had advanced pursuant to a participation agreement similar to the Participation Agreement entered into with M.A. Funding.

43.    The false representations of the aforementioned facts have caused injury to plaintiff and have defrauded plaintiff of his money.

44.    Plaintiff reasonably relied to his detriment upon the misrepresentation of material facts and concealment of material facts.

45.    The fraudulent actions and misrepresentations of Patel have directly damaged plaintiff in the sum of One Hundred Thousand Dollars ($100,000 ) plus 18,000 per year from the date of the last payment on November 14, 2002 and continuing at the rate of 18% per year.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST
## STERLING FOR BREACH OF CONTRACT

46.    Plaintiff repeats and reiterates each and every allegation previously alleged as though more fully set forth herein at length.

47.    Sterling contractually bound itself pursuant to its contract with M.A. Funding, dated April 25, 2001, as amended July 27th, August 23rd and September 21st, 2001, to occupy the status of trustee for the benefit of M.A. Funding's benefit with regard to M.A. Funding's participation in the monies due under the Loan Agreement and to hold M.A. Funding participating interest and the collateral securing the same as M.A. Funding's trustee.

48.    Sterling's actions as herein alleged including, but not limited to, its failure as trustee to monitor and preserve the collateral securing plaintiff's investment, was a breach of the Participation Agreement.

49.    That plaintiff, as assignee of all the rights of M.A. Funding, or as third party beneficiary of the contract between Sterling and M.A. Funding, has standing to sue under said contract.

50.    That as a result of Sterling's breach plaintiff has been damaged plaintiff in the sum of One Hundred Thousand Dollars ($100,000.00) plus 18,000 per year from the date of the last payment on November 14, 2002 and continuing at the rate of 18% per year.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST
## STERLING FOR BREACH OF FIDUCIARY DUTY

51.    Plaintiff repeats and reiterates each and every allegation previously alleged as though more fully set forth herein at length.

52.    Sterling had a fiduciary duty to M.A. Funding and to its investors to properly disclose all information, facts and other related matters concerning the repayment of the M.A. Funding loan.

53.    Sterling breached the fiduciary duties of good faith, fair dealing and full and fair disclosure.

54. That as a result of Sterling's breach plaintiff has been damaged plaintiff in the sum of One Hundred Thousand Dollars ($100,000.00) plus 18,000 per year from the date of the last payment on November 14, 2002 and continuing at the rate of 18% per year.

## AS AND FOR A SIXTH CAUSE OF ACTION AGAINST STERLING FOR BREACH OF FIDUCIARY DUTY

55. Plaintiff repeats and reiterates each and every allegation previously alleged as though more fully set forth herein at length.

56. That Sterling had a duty to the plaintiff to act with reasonable care in monitoring the loan advanced pursuant to the Loan Agreement.

57. That Sterling was negligent in failing to exercise reasonable care to insure that there was sufficient collateral at all times to protect plaintiff's investment.

58. That as a result of Sterling's negligence plaintiff has been damaged plaintiff in the sum of One Hundred Thousand Dollars ($100,000.00) plus 18,000 per year from the date of the last payment on November 14, 2002 and continuing at the rate of 18% per year.

WHEREFORE, plaintiff demands judgment on each of the alleged six causes of action in the sum of One Hundred Thousand Dollars ($100,000.00) plus 18,000 per year from the date of the last payment on November 14, 2002 and continuing at the rate of 18% per year until payment is made by defendants in full.

Dated: New York, New York
      October 18, 2005

Biaggi & Biaggi, Esqs.
By: Richard M. Biaggi, Esq.
220 Fifth Avenue – Suite 1702
New York, New York 10007

## ATTORNEY'S VERIFICATION

STATE OF NEW YORK, COUNTY OF NEW YORK SS:

That **Mario Biaggi Jr.** being duly sworn, deposes and says I, the undersigned attorney admitted to practice in the courts of New York State, state that I am the attorney(s) of record for the defendant in the within action; I have read the foregoing **"Verified Complaint"** and know the contents thereof; the same is true to my knowledge, except as to matters therein alleged to be on information and belief, and as to those matters I believe them to be true. The reason this verification is made by me and not by **the plaintiffs, is because the plaintiffs do not reside in the County where I have my office.** The grounds of my belief as to all matters not stated upon my own knowledge are as follows: **Correspondence and other writings furnished to me by the plaintiffs as well as conversations had with the plaintiffs.**

I affirm that the foregoing statements are true, under the penalties of perjury.

Dated: October 18, 2005

Richard M. Biaggi Esq.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER: COMMERCIAL PART
-------------------------------------------------------------------X

ANTHONY MAURO, A SHAREHOLDER, OF            Index No.: 09567/07
MERCHANTS ADVANTAGE CORPORATION,
SUING IN THE RIGHT OF MERCHANTS
ADVANTAGE CORPORATION,

                                        Plaintiff(s),

            -against-

STERLING NATIONAL BANK, a/k/a STERLING
FINANCIAL SERVICES, a/k/a STERLING BANK
CORP., JOHN GALLO AND ARUN PATEL,

                                        Defendant(s).
-------------------------------------------------------------------X

## NOTICE OF MOTION

**BIAGGI & BIAGGI**
**220 FIFTH AVENUE- SUITE 1702**
**NEW YORK, NEW YORK 10001**